RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-6034

RESHON TOLLIVER,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:17-cr-20060-16—Sheryl H. Lipman, District Judge.

Decided and Filed:  January 29, 2020

Before:  COLE, Chief Judge; COOK and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Jarrod J. Beck, LAW OFFICE OF JARROD J. BECK, PLLC, Lexington, Kentucky, for Appellant.  Mark A. Erskine, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

The court delivered a PER CURIAM opinion.  THAPAR, J. (pp. 7–8), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

PER CURIAM.  The government accused Reshon Tolliver of participating in a nationwide marijuana distribution ring.  The conspiracy funneled money and drugs between a supplier in California and a large-scale dealer in Memphis.  The government believed that

Tolliver helped the California supplier transport marijuana and move money around. Tolliver fought the charges at trial. After four days and several witnesses, the jury acquitted him on the marijuana conspiracy but convicted on the money laundering conspiracy.

Tolliver now appeals. He argues: (1) the district court violated the Speedy Trial Act, (2) the evidence was not enough to convict him, and (3) the district court erred in calculating the forfeiture amount.

1. *The Speedy Trial Act*. The Speedy Trial Act requires that the government try a criminal defendant within 70 days (with certain delays excused) of the defendant's indictment or first court appearance, whichever comes later. *United States v. Sherer*, 770 F.3d 407, 410–11 (6th Cir. 2014). If courts do not follow the Speedy Trial Act's 70-day rule, the remedy is dismissal (either with or without prejudice). 18 U.S.C. § 3162(a)(2).

Defendants also face their own requirements under the Speedy Trial Act. *See Sherer*, 770 F.3d at 411. The Act requires that defendants make a motion to dismiss on speedy trial grounds. And in *Sherer*, we explained that a defendant must make that motion *after* the deadline has passed. *Id.* In other words, "[t]he proper course [is] to challenge the continuance on day seventy-one (or later)[.]" *Id.* So a defendant can only complain about a speedy trial violation after the violation has already occurred.

*Sherer* governs here, and Tolliver failed to meet its requirements. Even construing his objection on April 26, 2018, as a motion to dismiss under the Act, his objection came too soon. The tally had not yet hit 70 days. By way of background, certain days are excluded from the count under the Speedy Trial Act. 18 U.S.C. § 3161(h). Those include days during which pre-trial motions are pending and delays that further the ends of justice. *Id.* § 3161(h)(1)(D), (h)(7)(A). When Tolliver objected, 86 calendar days had passed since his initial appearance. But not all of those days count. At a minimum we would have to exclude the five days while Tolliver's motion for bond was pending. *Id.* § 3161(h)(1)(D). Plus the 13 days before his April 26 hearing, which Tolliver asked be excluded in a motion to continue. The district court properly excluded that time because it served the ends of justice for Tolliver to receive the extra days to decide whether to go to trial. Thus, subtracting 18 days from 86, the total number of

countable days falls below 70.  Because Tolliver cannot meet *Sherer*'s timing requirement, his claim asserting a violation of the Speedy Trial Act cannot prevail.

2.  *Sufficiency of the Evidence.*  Tolliver argues we should unwind the jury's decision to find him guilty of conspiracy to commit money laundering.  He faces an uphill battle.  After all, we take the evidence in the light most favorable to the prosecution and ask whether *any* rational trier of fact could have found Tolliver guilty.  *United States v. Skinner*, 690 F.3d 772, 781 (6th Cir. 2012), *abrogated on other grounds as stated in United States v. Penny*, 777 F. App'x 142, 150–51 (6th Cir. 2019).  The jury is the backbone of our constitutional system.  As the Anti-Federalists recognized, juries "have so long been considered the surest barrier against arbitrary power, and the palladium of liberty[.]"  Luther Martin, *The Genuine Information Delivered to the Legislature of the State of Maryland Relative to the Proceedings of the General Convention Lately Held at Philadelphia*, in 2 *The Complete Anti-Federalist* 19, 70 (Herbert J. Storing ed. 1981) (emphases omitted).  As unelected judges, we must give juries due deference.

Tolliver challenges not only the *amount* of evidence the government put forth against him, but also the *type* of evidence.  So we first consider whether the government was trying to prove the right thing, then whether they put forth enough proof.

As to the type of evidence, Tolliver says the government did not prove money laundering, just payment for drugs.  Tolliver cites an out-of-circuit case that he says supports the idea that payment for drugs alone cannot be money laundering.  *See United States v. Harris*, 666 F.3d 905 (5th Cir. 2012).  But even if that were true, the holdings of our sister circuits do not bind us. Rather, the binding precedent of our *own* circuit makes clear:  payment for drugs *can* constitute promotional money laundering.  *See Skinner*, 690 F.3d at 782; *see also United States v. Williamson*, 656 F. App'x 175, 184 (6th Cir. 2016) (collecting cases).

The idea is that using money gained from drug sales to buy more drugs *promotes* the conspiracy by allowing it to continue or grow.  *United States v. Crosgrove*, 637 F.3d 646, 654 (6th Cir. 2011).  In a sense, the defendant *reinvests* the proceeds into the conspiracy, thus promoting it.  It's a bit like reinvesting a stock dividend, or "letting it ride" after a lucky gambling win.

And that's what happened here.  The government's evidence went to whether Tolliver engaged in promotional money laundering.  Indeed, our circuit has held that "[t]he paradigmatic example" of promotional money laundering "is a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales."  *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010).

That the money Tolliver allegedly moved around was income and not profits does not change things.  The Supreme Court once held that the government had to prove in certain cases that laundered money was profit, not just income.  *United States v. Santos*, 553 U.S. 507 (2008).  But Congress quickly amended the law so that was no longer true.  *Wooten v. Cauley*, 677 F.3d 303, 309 n.1 (6th Cir. 2012) ("Congress overruled *Santos* in 2009 when it amended 18 U.S.C. § 1956 to define 'proceeds' as 'gross receipts' in all contexts."); *see* 18 U.S.C. § 1956(c)(9).  Now, receipts are always enough.

So the government did present the right type of evidence to prove promotional money laundering.  The question, then, is whether they put forth enough evidence to make their case.

To prove conspiracy to commit promotional money laundering, the government had to show that Tolliver knowingly and voluntarily joined an agreement between two or more people to (1) conduct a financial transaction from the proceeds of illegal activity, (2) knowing the money came from illegal activity, and (3) intending to promote that activity.  *Warshak*, 631 F.3d at 317.

The government did just that.  Based on the evidence at trial, a reasonable factfinder could find that Tolliver conspired to launder money.

*First*, the government showed that Tolliver made financial transactions with money from illegal marijuana sales.  For example, an FBI agent testified that Tolliver used bank accounts bearing his name to transfer drug money back and forth across the country.  The government showed the jury bank records and several surveillance images depicting Tolliver making these transactions.  It also showed the jury a photo of Tolliver with the leader of the marijuana supply operation.  And it showed a video of the supply ringleader handing off a debit card to Tolliver,

with Tolliver later using the debit card at an ATM. Finally, the FBI agent testified that a co-conspirator revealed that Tolliver was a "Do-Boy" for the supply kingpin. R. 698, Pg. ID 3155.

*Second*, to show Tolliver's knowledge, the government pointed to compelling circumstantial evidence showing he knew what he was doing. For example, the agent mentioned the close relationship between Tolliver and the supply ringleader, including their photograph together. He also pointed to the fact that Tolliver sometimes used accounts not bearing his name with debit cards that were not his, suggesting he knew something illicit was going on. He showed that Tolliver was getting a cut of the proceeds, as he would often receive a deposit thousands of dollars larger than he would later withdraw. Finally, the government discussed timing. Not only was Tolliver making the financial transactions for a long time, he also appeared to coordinate his actions with others in the conspiracy. In one case, he withdrew money from the ATM immediately after money was deposited into his account by a co-conspirator. The jury could infer from this coordination that Tolliver knew he was involved in the conspiracy.

*Third*, the government showed that Tolliver's actions promoted the conspiracy as the financial transactions freed up money to buy more drugs. For example, wiretapped phone calls showed the leaders of the conspiracy asking for more payment so that they could purchase more marijuana. And the payments to the supplier covered both past purchases and prepayment for future drugs. The jury could draw a connection between this evidence and the evidence of Tolliver's close relationship with the leader of the California operation to conclude that Tolliver intended to promote the conspiracy.

Overall, the government put forth enough evidence on each element of Tolliver's crime. Thus, we do not unwind the jury's decision.

3. *Forfeiture.* When someone gets paid through money laundering, the law requires they forfeit the money laundered and any property traceable to the crime. The parties agree that Tolliver should forfeit the laundered money in his accounts. But they disagree about whether the district court properly included some of Tolliver's gambling winnings and a $40,000 addition based on testimony at sentencing.

The government must support forfeiture by a preponderance of the evidence and must show a nexus between the property and the crime. *See* 21 U.S.C. § 853(a); *United States v. Jones*, 502 F.3d 388, 391–92 (6th Cir. 2007). Basically, the government must show that it was more likely than not that the defendant either (1) gained the money from the illegal activity or (2) *derived* the money from other money or property gained from the illegal activity. *United States v. Smith*, 749 F.3d 465, 488 (6th Cir. 2014). In any case, the money must be traceable to the offense. *Id.*

The district court did not err in finding that Tolliver's gambling winnings fell under this umbrella. Tolliver gambled hundreds of thousands of dollars but put forth no evidence that he had *any* source of income besides the cuts he got from the money laundering scheme. Indeed, Tolliver filed no tax return for the two years in question. The district court also considered the timing of Tolliver's gambling. He was a long-time gambler, but the amount of money he gambled skyrocketed once he joined the conspiracy. In the five years before his involvement in the conspiracy, he never gambled with more than $23,000 per year. Yet in 2017, he gambled over *thirty times* that much at $712,000. The district court did not err in deciding that this made it more likely than not that Tolliver gambled with laundered money.

So too, the district court did not err in adding the $40,000 based on testimony at sentencing. There, the FBI agent said that he spoke with a co-conspirator who said she delivered cash to Tolliver on more than one occasion (plus the bank transfers already accounted for). And wiretap discussions showed that the average amount of cash she delivered was $40,000. The district court found this evidence reliable. But in an abundance of caution, it only added $40,000 to the forfeiture calculation, even though the co-conspirator said she delivered money to Tolliver more than once. Here again, a preponderance of the evidence shows that Tolliver would have received *at least* $40,000 in cash as part of the money laundering conspiracy.

For these reasons, the forfeiture calculation passes muster, as does the jury's verdict and the district court's trial timing. We affirm.

---

**CONCURRENCE**

---

THAPAR, J., concurring.　Rules are rules.　In the Speedy Trial Act, Congress created a clear rule that gave parties and judges notice of their rights and obligations.　In doing so, Congress set forth how to get a case dismissed for violations of the Act: move for dismissal. 18 U.S.C. § 3162(a)(2).　And failure to make such a motion "constitute[s] a waiver of the right to dismissal[.]" *Id*.　This plain and simple process made the law easy to follow for both parties and busy district courts.

Then, like a council of revision, our court intervened to edit Congress's work.　*See United States v. Brown*, 819 F.3d 800, 825 (6th Cir. 2016); *see also Collins v. Mnuchin*, 938 F.3d 553, 610–11 (2019) (en banc) (Oldham, J. and Ho, J., concurring in part and dissenting in part) (recounting that the Founders rejected a "council of revision" that would have given federal judges veto power over legislation).　In the process, we turned a clear rule into a standard—all the while muddying the process.　No longer need a defendant make a motion to dismiss.　*Brown*, 819 F.3d at 825.　Instead, an oral objection that does not ask the district judge to dismiss the charges can sometimes be enough.　*Id.*

In doing so, I am not sure our court thought through the consequences.　Imagine a defendant wants to object to a continuance, but not request a last-minute dismissal.　Why would a defendant want to do this?　Well, maybe because he doesn't want to start over.　After all, the district court may dismiss the case without prejudice.　18 U.S.C. § 3162(a)(2).　And for a detained defendant, this is not great.　The government simply re-indicts.　And that often results in continued detainment for the defendant.　So what looked like a lifeline for defendants who fail to move to dismiss may not be that at all.

Another reason that a defense attorney may not move to dismiss—the weakness of the government's case.　Imagine you are on the eve of trial and the government needs a continuance to gather some evidence.　Again, the defendant may want to object to any and all continuances, but not move to dismiss.　Because, as just discussed, the consequence could be dismissal without

prejudice.  And now the government can do what it couldn't do before—gather the evidence. Here, the lifeline turns out to be for the government.

With our new standard, district courts are left guessing.  Is that objection a motion to dismiss or just an objection?  Clarity benefits everyone—the courts, the public, and criminal defendants.  That's one reason, among many, that judges must follow the statutory text.  *See* Amul R. Thapar & Benjamin Beaton, *The Pragmatism of Interpretation*, 116 Mich. L. Rev. 819 (2018).  Judges should interpret the law—we shouldn't redline Congress's work.  Indeed, when judges rewrite the words agreed upon by Congress and the President, we aggrandize our power beyond its limits.  *See In re Univ. of Michigan*, 936 F.3d 460, 462–63 (6th Cir. 2019).  That's why the text—not our preferred outcome or better judgment—must always be the beginning and end of interpretation.

That brings us to this case.  I would affirm because Tolliver did not request dismissal— either orally or in writing.  But even if we imagine that he did, I agree that motion came too late. So I concur.