NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0174n.06

Nos. 19-6428/6429

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 06, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JOHN SHIELDS, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |

Before: STRANCH, LARSEN, and NALBANDIAN, Circuit Judges.

LARSEN, Circuit Judge. John Shields was charged with and convicted of committing several offenses related to his participation in a drug-trafficking enterprise. On appeal, he raises a host of issues, ranging from the district court's refusal to hold an evidentiary hearing on his double jeopardy claim to the procedural reasonableness of his sentence. We AFFIRM.

I.

A.

Sometime around March 2013, law enforcement began investigating the Memphis Peda Roll Mafia (PRM), a street gang associated with the Los Angeles-based Grape Street Crips. Fred McCaster, Jr. was the leader of the Memphis PRM, and he testified that his membership in the gang "enhanced" his ability to obtain drugs from suppliers in California. For instance, a fellow gang member introduced McCaster to Eric and Calvin Avendano, two members of what appears to be a different gang—the Grape Street Tiny Wynos. And McCaster also began working with

Reginald Wright, Jr., a "close associate of [the] Grape Street Crips." McCaster eventually leveraged these connections to distribute a variety of drugs in Memphis: Wright supplied him with marijuana, and the Avendanos provided harder drugs as well, including crystal meth, heroin, and cocaine.

At some point, McCaster initiated Shields into the Memphis PRM. With McCaster's blessing and introduction, Shields was then able to work with the Avendano brothers and Wright as his own suppliers. But the law soon caught up with Shields. Based on a multi-year investigation into the Memphis PRM, the government discovered that Shields had engaged in the trafficking of a number of drugs, including marijuana, heroin, and methamphetamine. On May 25, 2017, a grand jury returned separate indictments charging Shields with participation in the Avendano and Wright drug-trafficking conspiracies, and with associated drug-trafficking charges.

According to the Wright indictment—to which Shields pleaded guilty—Shields participated in a conspiracy to possess and distribute marijuana on behalf of Wright's organization from March 2013 through May 2017. The plan was straightforward. Using mainly the U.S. Postal Service as an unwitting courier, Wright would ship the marijuana from California to Shields and others in Tennessee. In exchange, Shields would deposit cash into certain Wells Fargo and Bank of America accounts, and Wright and his associates would withdraw the money in California. Based on these allegations, Shields pleaded guilty to: (1) conspiracy to possess with intent to distribute marijuana; (2) possession with intent to distribute marijuana; and (3) conspiracy to commit money laundering.

The Avendano indictment charged Shields with participating in a separate conspiracy from March 2013 until September 2015 to possess and distribute two different drugs—heroin and methamphetamine—on behalf of the Avendano organization. As alleged in the indictment, the

Avendanos would mail heroin and methamphetamine to Shields, who would then pay for the drugs by depositing cash into various Wells Fargo and Bank of America accounts controlled by the Avendanos. The grand jury accordingly charged Shields with: (1) conspiracy to possess with the intent to distribute heroin (Count 1); (2) conspiracy to possess with the intent to distribute methamphetamine (Count 2); and (3) conspiracy to money launder (Count 9). As further described below, the grand jury also indicted Shields on one count of (4) aiding or abetting possession with the intent to distribute heroin (Count 6), based on the interception of a Memphis-bound package containing the drug.

Following his guilty plea in the Wright case, Shields joined a codefendant's motion to dismiss the methamphetamine and heroin conspiracy charges in the Avendano indictment on double jeopardy grounds. The defendants argued that the Wright and Avendano indictments separately charged what was, in reality, "a single, unified conspiracy." After a hearing on the merits, the district court disagreed and denied the defendants' motion to dismiss. It also denied the defendants' request for an evidentiary hearing.

B.

Shields then proceeded to trial on the Avendano charges. As to the conspiracy counts, Shields' strategy was to admit to the jury that he dealt marijuana but to argue that he was not involved in the Avendanos' distribution of methamphetamine and heroin. However, the government introduced extensive evidence contradicting this theory.

First, many of Shields' coconspirators testified against him. McCaster testified that the Avendanos provided Shields with "[c]rystal meth and heroin" and explained how he had initially

vouched for Shields so that he could work with the Avendanos. Timothy Wright[1] testified that Shields told him "something about" receiving "ice water" or "meth" from the Avendanos. Jeremy Davis spoke extensively about his and Shields' dealings with heroin and said that they had received shipments of heroin from the Avendanos. And Eric Avendano explained how his family's organization operated—by sending drug-filled packages through the mail and using Bank of America and Wells Fargo accounts to collect payment from their Memphis associates. Eric further testified that he knew that his brothers, Calvin and Jeffrey Avendano, provided Shields with heroin and other drugs.

In addition, the government introduced text messages sent to a Los Angeles-area number from a phone seized from Shields' pocket. The messages contained several pieces of incriminating evidence linking Shields to the conspiracy: tracking numbers for packages; requests for Memphis addresses to mail drugs to; texts confirming payment; references to Wells Fargo and Bank of America accounts that Eric Avendano recognized as accounts his organization used for funneling money; and requests by Shields for "bottles" of "glass," which Eric identified as code in his organization for "pounds of meth." The call logs on the phone also showed multiple calls between Shields and two of the Avendano brothers.

Furthermore, a forensic auditor discussed his investigation into the bank accounts referenced in the text messages on Shields' phone. His review of Bank of America and Wells Fargo bank statements showed that, on dozens of occasions, an individual in Memphis had deposited $9,000 into the accounts, and that same amount was quickly withdrawn in California.

---

[1] Based on the record, there does not appear to be any relation between Timothy Wright, a Memphis resident, and Reginald Wright, Jr., the California-based supplier named in the Wright indictment.

The government connected those deposits to Shields by introducing surveillance video from the Memphis-area banks that captured Shields making large cash deposits into the listed accounts.

A postal inspector next testified that he had identified over 200 suspicious packages throughout the investigation into the Memphis PRM. Several of them had been seized by law enforcement and were found to contain methamphetamine, heroin, cocaine, or marijuana.

One of those seized packages is relevant to Shields' charge for aiding and abetting possession with the intent to distribute heroin (Count 6). On September 17, 2015, a police officer obtained a search warrant to inspect a 20-pound package sent from Los Angeles to Memphis. The package contained two bricks of heroin sealed inside a metal box. Officials removed the heroin, resealed the package, and "prepare[d] for what's called a controlled delivery . . . to get the suspects who would be receiving the box into custody."

Meanwhile, text messages showed that Shields had provided Jeremy Davis, one of Shields' coconspirators, with a tracking number for this particular heroin-filled package. Davis testified that on the morning of September 17, Shields also called to tell him "that it was green light that the package had arrived," and Davis admitted that they were "expecting" heroin to be in the package. When Davis arrived to pick up the package, he was quickly apprehended by police. Davis then cooperated with the arresting officers, and he turned over his phone "[t]o show the address and tracking number that [he] received from [Shields]." He also placed a recorded phone call to Shields while in custody, in an attempt to get "Shields to pick the package up." But that effort was unsuccessful, as Shields had already heard that Davis had been arrested.

## C.

Toward the end of Shields' trial, the government asked the district court to issue the following joint-possession instruction for Count 6:

> The government does not have to prove that the defendant was the only one who had possession of the alleged controlled substances. Two or more people can together share actual or constructive possession over property. If they do, both are considered to have possession as far as the law is concerned.
>
> But remember that just being present with others who had possession is not enough to convict. The government must prove the defendant had either actual or constructive possession of the alleged controlled substances and knew that he did for you to find him guilty of this crime.

This was nearly identical to our pattern instruction. *See* Pattern Crim. Jury Instr. 6th Cir. 2.11. But Shields objected, claiming there was no "evidence to suggest that there was any joint possession of that particular package between Mr. Shields and anyone else." The district court overruled Shields' objection, reasoning that Davis had testified that he and Shields were "partners," and "when [Davis] grabbed the package, he was doing it jointly with Mr. Shields."

After less than two hours of deliberation, the jury convicted Shields on all four counts. The parties then agreed to consolidate Shields' sentencing for his convictions under the Avendano and Wright indictments. Although the advisory Sentencing Guidelines called for life imprisonment, the government asked for 30 years at the sentencing hearing. The district court decided to go even lower. It sentenced Shields to concurrent aggregate prison terms of 95 months for the three convictions under the Wright indictment, and 240 months for the four convictions under the Avendano indictment.

Shields timely appealed. He raises several issues, including: (1) the district court's refusal to hold an evidentiary hearing on his double jeopardy claim; (2) insufficiency-of-the-evidence claims for three of his four convictions; (3) a pair of evidentiary challenges; (4) a challenge to the joint-possession instruction; and (5) a handful of claims related to the procedural reasonableness of his sentence.

II.

We turn first to Shields' contention that the district court "deprived him of a fair and reliable adjudication of his double jeopardy claim" by forgoing an evidentiary hearing. On this front, Shields does not ask us to review the merits of his double jeopardy claim. He asks that the case "be remanded for an evidentiary hearing" so that claim can "be further explored."

We review the district court's refusal to hold an evidentiary hearing for an abuse of discretion. *United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005). "A finding of an abuse of discretion requires 'a definite and firm conviction that the trial court committed a clear error of judgment.'" *Blue Diamond Coal Co. v. Trs. of the UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001) (quoting *Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990)).

We are left with no such conviction here. The district court explained that it was not holding an evidentiary hearing "because the parties did not disagree about the facts. They only disagreed about the legal implications of those facts." The court, accordingly, held a hearing at which the parties could argue those legal implications. That was not an abuse of discretion.

To be sure, the "general rule" in this circuit is that "once a defendant has put forth a non-frivolous claim of double jeopardy, the court should hold an evidentiary hearing to resolve any factual disputes that arise." *In re Grand Jury Proceedings*, 797 F.2d 1377, 1385 (6th Cir. 1986). But we are not aware of any context in which we have held that a defendant is entitled to an evidentiary hearing without making "at least some initial showing of contested facts." *United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988). Further, this showing must be "sufficiently definite, specific, detailed, and non-conjectural to enable the district court to conclude that contested issues of fact" actually exist. *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (emphasis and citation omitted); *see also Gonzales v. Galvin*, 151 F.3d 526, 535 (6th Cir. 1998)

("Evidentiary hearings are not necessary where the parties' briefs clearly set forth the relevant facts and arguments of a case such that a hearing would not add anything to the briefs . . . .").

Even in his brief to us, Shields does not dispute any of the facts upon which the district court based its decision. Thus, Shields was not entitled to an evidentiary hearing on his double jeopardy claim, and the district court did not err in rejecting his request for one. *See United States v. Ickes*, 922 F.3d 708, 713 (6th Cir. 2019); *United States v. Gross*, 1 F.3d 1242, 1993 WL 300393, at *1, *3 (6th Cir. 1993) (table) (per curiam) (upholding the district court's denial, "without holding an evidentiary hearing," of a motion to dismiss an indictment on double jeopardy grounds based "upon the proffers submitted by the parties").

III.

Shields' next raises an evidentiary challenge; we again review for an abuse of discretion. *See United States v. Collins*, 799 F.3d 554, 577 (6th Cir. 2015). Shields believes that the district court erred in admitting evidence of his gang affiliation, because it "was not relevant to the key contested issue in the case." To Shields, the only contested issue was whether the Avendanos supplied him with heroin and methamphetamine, as opposed to marijuana. This argument is a nonstarter.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. That's a low bar to admission. We have explained that "[e]vidence of gang affiliation is relevant where," for instance, "it demonstrates the relationship between people and that relationship is an issue in the case, such as in a conspiracy case." *United States v. Ford*, 761 F.3d 641, 649 (6th Cir. 2014). On the other hand, such evidence is inadmissible when "there is *no*

connection between the gang evidence and the charged offense." *Id.* at 650 (emphasis added) (quoting *United States v. Anderson*, 333 F. App'x 17, 24 (6th Cir. 2009)).

Here, the evidence falls on the relevant side of the line. The government bore the burden of establishing Shields' participation in the Avendano conspiracy to sell methamphetamine and heroin. *See United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). And the gang-related evidence was highly probative of that participation. McCaster knew Shields well enough to "bless[] him" into the PRM, a clique within the Grape Street Crips. McCaster's membership in the PRM "enhanced" his ability to obtain drugs from the Avendanos. And due to that relationship, the Avendanos "always called [McCaster] on the phone" "whenever they wanted to work with somebody else" in Memphis, including Shields. Evidence of Shields' gang affiliation was therefore probative of his ability to develop a business relationship with the Avendanos. As the district court explained, Shields' "membership in the Peda Roll Mafia and the Grape Street Crips [was] the springboard that allowed Mr. Shields to then work with Mr. McCaster and with the Avendano family in terms of obtaining the drugs." The gang relationship was "the glue that connect[ed] these parties" and showed "how they kn[e]w one another and worked together." We have little trouble concluding that this evidence was relevant to establish "the interrelationship of the individuals participating in the conspiracy." *United States v. Miller*, 48 F. App'x 933, 948 (6th Cir. 2002) (citing *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999)).

Shields responds that what made the evidence irrelevant is that he "did not contest the fact that he had an illegal business relationship with the Avendano Organization" selling marijuana. But this argument is triply flawed. First, McCaster testified that the Avendanos provided Shields with "[c]rystal meth and heroin," and so the gang-related evidence was equally probative of Shields' ability to deal in these harder drugs. Second, Shields did not stipulate—or even offer to

stipulate—to the existence of the drug conspiracies or his participation in them. The government still had the burden of proving these elements beyond a reasonable doubt. *See United States v. Ray*, 803 F.3d 244, 259 (6th Cir. 2015). Third, even if Shields had made such an offer, the government is entitled in cases like this one to prove its case free from a defendant's preference to stipulate otherwise relevant evidence away. *Old Chief v. United States*, 519 U.S. 172, 189 (1997); *see United States v. Rios*, 830 F.3d 403, 422 n.5 (6th Cir. 2016) (deeming it "irrelevant" in a conspiracy case that "the defendants did not contest their membership in the [gang]"). Shields would have had no basis to "stipulate or admit his way out of the full evidentiary force of the case as the Government cho[se] to present it." *United States v. Luck*, 852 F.3d 615, 626 (6th Cir. 2017) (quoting *Old Chief*, 519 U.S. at 186–87).

Additionally, to the extent Shields raises a challenge under Federal Rule of Evidence 403, he has not shown that the "probative value" of the gang-related evidence was "substantially outweighed" by any danger of "unfair prejudice." Fed. R. Evid. 403. Of course, "[t]rial courts must treat evidence of gang affiliation with care since most jurors are likely to look unfavorably upon a defendant's membership in a street gang." *United States v. Tolbert*, 8 F. App'x 372, 378 (6th Cir. 2001). But here, the evidence served a valid purpose. It helped illustrate Shields' interrelationship, coordination, and ability to deal with his coconspirators. And it was highly probative as to both the existence of the charged conspiracies and Shields' association with them. "The district court's limiting instruction about the narrow uses for this evidence also diminished any *unfair* prejudice by reducing the risk that the jury would put the evidence to an improper purpose." *Potter*, 927 F.3d at 452. During trial, the district court advised the jury that "being a member of a gang is not itself unlawful." It further explained that the "evidence of gang membership [was] offered here to show a relationship among some of the individuals in this case

and should not be considered by you for any other purpose." The district court repeated this limiting instruction before submitting the case to the jury. Shields offers nothing to overcome the presumption that the jury followed these clear limiting instructions. *See United States v. Burns*, 298 F.3d 523, 543 (6th Cir. 2002).

Accordingly, the district court did not abuse its discretion by admitting evidence of Shields' affiliation with the Peda Roll Mafia and the Grape Street Crips.

IV.

We now move to Shields' sufficiency-of-the-evidence challenges. Shields contends that, based on the evidence introduced at trial, no rational jury could have convicted him on three of the four counts: Count 1 (conspiracy to possess and distribute methamphetamine), Count 6 (aiding and abetting possession with intent to distribute heroin), and Count 9 (conspiracy to commit money laundering). Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this assessment, "'[w]e do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury,' and '[c]ircumstantial evidence alone is sufficient to sustain a conviction.'" *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (second alteration in original) (citations omitted).

A.

The evidence introduced at trial was more than sufficient to support Shields' conviction for conspiracy to commit money laundering. To prove this charge, the government had to show that Shields "knowingly and voluntarily joined an agreement between two or more people to (1) conduct a financial transaction from the proceeds of illegal activity, (2) knowing the money

came from illegal activity, and (3) intending to promote that activity." *United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020) (per curiam); *see* 18 U.S.C. § 1956(a)(1), (h).

Shields says that the evidence falls short on the "proceeds" element. He notes that there was no testimony that Shields used any *profits* from drug sales to prepay the Avendanos for future shipments of drugs. Instead, the evidence showed that Shields deposited *income* from sales produced by the previous drug shipment to reimburse the Avendanos and prompt the next shipment. That is a distinction without a difference. The money laundering statute explicitly defines "proceeds" to "includ[e] the gross receipts" that a defendant obtains "through some form of unlawful activity." 18 U.S.C. § 1956(c)(9). It thus does not matter "[t]hat the money [Shields] allegedly moved around was income and not profits" from illicit drug sales. *Tolliver*, 949 F.3d at 248; *see also United States v. Skinner*, 690 F.3d 772, 782 (6th Cir. 2012).

Applying this standard, a rational juror could easily have found that Shields made financial transactions using money obtained from the sales of illegal narcotics. Consider, first, the nature of the scheme itself: "If you sell and pay, you get more drugs[.]" Eric Avendano testified that his organization would often "front" drugs to distributors in Memphis by sending the drugs through the mail. In turn, the organization used two national banks—Bank of America and Wells Fargo— to receive payment. To make it all work, the Avendanos would send text messages containing the bank account information of one of several individuals to the Memphis distributors, who would typically deposit $9,000 at a time into the accounts. McCaster and Davis both confirmed that they would make $9,000 deposits into Bank of America and Wells Fargo accounts, "[b]ecause anything . . . over ten would probably be a red flag at the bank." After the deposits were made in Memphis, somebody from Los Angeles would withdraw the money, often the next day. This scheme plainly violated the money laundering statute. *See United States v. King*, 169 F.3d 1035,

1039 (6th Cir. 1999) (explaining that paying for drugs delivered on consignment "constitute[s] 'promotion' for the purposes of the money laundering statute when," as here, "such payment encourages further drug transactions"); *Tolliver*, 949 F.3d at 248 (similar).

Then there was plenty of evidence linking Shields to the scheme. Davis testified that he had accompanied Shields to the bank when Shields had made deposits in the past. Surveillance footage from Bank of America and Wells Fargo showed Shields depositing large amounts of cash at times corresponding to several of the $9,000 transactions identified by the government. Sums corresponding to those deposits were all withdrawn shortly thereafter in Los Angeles. Beyond that, the government introduced text messages between Shields' phone and a Los Angeles number from January 2015. After Shields sent an address for delivery, he said, "[s]end the numbers." The response was "Aurora Gran," followed by a bank account number, the letters "B-O-A," and the number "9000." A few days later—and the same day a 20-pound package was delivered from California to the address Shields had provided—surveillance footage showed Shields depositing a stack of cash at a Memphis-area Bank of America. The name on the account? Aurora Gran. The amount deposited? $9,000. The location of withdrawal just a few days later? Los Angeles County. The amount withdrawn? $9,000. Everything about this transaction conformed with the Avendanos' money-laundering scheme and with the text messages on Shields' phone. There was sufficient evidence to support the jury's conviction on Count 9.

B.

The next sufficiency challenge concerns the type of drugs that Shields purveyed. Notwithstanding Shields' insistence that he "dealt solely in marijuana and had nothing to do with

other drugs marketed by the Avendanos," the evidence tells another story. A rational jury could have found that Shields conspired to possess and distribute methamphetamine.

To support this conviction, the government needed to prove three elements: (1) an agreement between two or more persons to possess with the intent to distribute methamphetamine, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the enterprise. *Potter*, 927 F.3d at 453; *see* 21 U.S.C. §§ 841(a)(1), 846. The existence of a conspiracy may be inferred through circumstantial evidence. *United States v. Faulkenberry*, 614 F.3d 573, 584 (6th Cir. 2010). And the agreement need not be explicit; rather, a "tacit or mutual understanding among the parties" will suffice. *Potter*, 927 F.3d at 453 (citation omitted).

The prosecution offered ample evidence to prove Shields' participation in the methamphetamine conspiracy. We begin with the testimony of his alleged coconspirators. First, Eric Avendano testified that he and his brothers shipped pounds of meth to the Memphis area. This was corroborated by federal investigators, who seized two packages destined for Memphis that contained large quantities of the drug and were linked to the Avendanos. Second, Fred McCaster—a known close associate of both the Avendanos and Shields—testified that he knew the Avendanos were providing Shields with crystal meth. Third, Timothy Wright testified that Shields told him he had received "ice water" or "meth" from the Avendanos.

Tack on to that the evidence from Shields' cell phone. Shields requested "four bottles" of "[g]lass" from a Los Angeles-area number. Eric Avendano testified that "[g]lass is meth" and that a "bottle" was a code word used in his organization to refer to a pound of meth. He rejected defense counsel's suggestion that a "bottle" might refer to other drugs, such as marijuana. On top of this specific conversation, Shields sent several other text messages to various numbers

concerning "bottles." The proof against Shields regarding the methamphetamine conspiracy was therefore strong, and a rational jury could have found him guilty beyond a reasonable doubt.

Shields offers two responses; neither persuade us. First, he says that the text-message evidence was not properly authenticated, insisting that the government didn't offer anything connecting the messages to Shields. Because he did not object on this point, we review for plain error. *See Collins*, 799 F.3d at 576. Even under de novo review, however, we would find that the government "produce[d] evidence sufficient to support a finding" that the text messages were sent by Shields. Fed. R. Evid. 901(a).

For one, the texts were extracted from the iPhone found in Shields' pocket during the execution of a valid search warrant. Moreover, there was circumstantial evidence linking Shields to the messages on the phone. For example, an incoming message instructed the recipient to deposit $9,000 into the "Aurora Gran" account at "B-O-A." The recipient responded on January 16, 2015 that he had done so. Bank records and surveillance footage from a Memphis-area Bank of America showed Shields depositing $9,000 into an account for Aurora Gran on that same date, exactly as instructed. Similarly, outgoing messages from the phone reported $9,000 going into an account for "Vanessa Sanchez." Bank records and surveillance footage likewise showed Shields depositing $9,000 into that account. In light of this evidence, a reasonable factfinder could conclude that Shields was the one sending the text messages from the phone seized from his pocket.

Second, Shields argues that there was no evidence that the Los Angeles number on the other side of the "four bottles" of "glass" conversation was held by a member of the Avendano organization. We disagree. Based on other evidence introduced at trial, a reasonable jury could believe just that. Eric Avendano testified that "bottles" was a code word that he and his brothers

used to refer to a pound of meth, thereby providing circumstantial evidence of identity. Eric also explained that to receive payment for their drug shipments, the Avendanos would text the names and numbers associated with Bank of America and Wells Fargo accounts to their associates in Memphis. That is consistent with what occurred in the exchange here. What's more, Eric even recognized the account names referenced in Shields' conversation, as those were some of the ones that he and his brothers used to funnel money back to California.

Despite this evidence, Shields makes much of the fact that Eric Avendano could not identify the Los Angeles number in the text exchange as belonging to one of his brothers. But this comes as little surprise. Eric explained that the Avendanos would each use three cell phones at a time with Los Angeles area codes to conduct their business, and they would throw all those phones away each month to avoid being tracked. The fact that Eric could not identify one of those ten-digit numbers more than two years later while on the stand does not change our conclusion. A reasonable factfinder could still believe that the counterparty to Shields' meth deal was a member of the Avendano conspiracy. Accordingly, there was sufficient evidence to find Shields guilty beyond a reasonable doubt on the methamphetamine conspiracy charge. We affirm the jury's conviction on Count 1.

C.

We now confront Shields' challenge to his conviction on Count 6. The prosecution could prove this charge by showing that Shields: (1) knowingly or intentionally, (2) possessed, (3) with the intent to distribute, (4) heroin. 21 U.S.C. §§ 812(c) & sched. I(b)(10), 841(a)(1). But "[p]roof of actual possession with intent to distribute is not necessary to sustain a conviction under 21 U.S.C. § 841(a)(1) as long as there is proof, beyond a reasonable doubt, that a defendant aided and abetted the criminal venture." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991); *see* 18

U.S.C. § 2. "In proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence.'" *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)).

On appeal, Shields argues that his aiding-and-abetting conviction cannot stand because there was no evidence that Jeremy Davis—the person Shields allegedly assisted—ever possessed any heroin on or about September 17, 2015 (the date listed in the indictment). That is not, however, what Shields argued below. To the contrary, in his Rule 29 motion, Shields' counsel took the opposite position and explicitly stated that he thought "the government ha[d] proven that Mr. Davis possessed heroin with intent to distribute" on September 17, 2015. He then asserted a different theory of insufficiency altogether—"that the evidence [didn't] show that Mr. Shields was involved with [the possession] or that he aided and abetted Mr. Davis in possessing that heroin with intent to distribute." And his post-trial motion for a judgment of acquittal also failed to press the argument he now makes on appeal.

"Although specificity of grounds is not required in a Rule 29 motion, where a Rule 29 motion is made on specific grounds, all grounds not specified are waived[.]" *United States v. Dandy*, 998 F.2d 1344, 1356–57 (6th Cir. 1993) (internal citation omitted). This is because "[t]he specification of grounds in the motion is an indication that counsel has evaluated the record and has these particular reasons for his motion." *Id.* at 1357 (citation omitted). In that case, we "do[] not review the omitted grounds *at all*; *i.e.*, we deem them completely waived." *United States v. Martinez-Lopez*, 747 F. App'x 326, 331 (6th Cir. 2018); *see also, e.g.*, *United States v. Osborne*, 886 F.3d 604, 618 (6th Cir. 2018); *United States v. Winkle*, 477 F.3d 407, 415 (6th Cir. 2007); *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005). Shields has therefore waived his new argument.

*Osborne* is particularly instructive on this point. There, as in this case, the defendant moved for a judgment of acquittal in the district court. *Osborne*, 886 F.3d at 618. In that motion, the defendant raised particular grounds for acquittal. *See id.* But he did not advance his appellate theory—that the evidence failed to show that another individual committed an element of the crime, and "thus Osborne could not have aided and abetted him in that crime." *Id.* "Because Osborne made a motion for judgment of acquittal on specified grounds, and those grounds did not include the claim that [was raised] on appeal," we held that he had waived his appellate argument. *Id.* So too here. As in *Osborne*, Shields is arguing that there was no evidence that Davis completed the crime of possession with intent to distribute heroin and thus Shields could not have aided and abetted Davis in its commission. Since this is distinct from the theory of insufficiency asserted below, Shields "cannot now raise this argument." *Id.* We affirm as to Count 6.

V.

Shields also claims that the district court erred in issuing a joint-possession instruction because there was no evidence that Davis possessed the heroin. *See generally United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987) ("[A]n instruction should not be given if it lacks evidentiary support . . . ." (citation omitted)). Shields did not object on this ground, so we review only for plain error. *See United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990); Fed. R. Crim. P. 30(d).

Shields has not shown plain error. The instruction was neither "prejudicial" nor did it "result[] in a miscarriage of justice." *United States v. Treadway*, 328 F.3d 878, 883–84 (6th Cir. 2003) (citing *United States v. Olano*, 507 U.S. 725, 735–36 (1993)). Shields contends that the instruction prejudiced him because it invited the jury to believe it could convict him based on joint possession with the law-enforcement officer who intercepted the package containing heroin. We

find that theory implausible. The government argued to the jury that it was Shields and Davis who shared a mutual interest in the package. Unsurprisingly, it never suggested that Shields might have "share[d] actual or constructive possession" of heroin "together" with a government official who was investigating him and whom he had never met. R. 493, PageID 2346 (jury instruction). We think it highly unlikely that the jury even contemplated such a possibility. We are therefore confident that the joint-possession instruction had no effect on the jury's verdict and did not affect Shields' "substantial rights." Fed. R. Crim. P. 52(b); *see Olano*, 507 U.S. at 734–35. There was no plain error.

VI.

We turn our attention finally to Shields' claims that the district court imposed a procedurally unreasonable sentence. Procedural reasonableness requires the sentencing court to "properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

A.

Shields first contends that the district court erred in its factual determination of the quantity of drugs attributable to him. We review that determination for clear error. *See United States v. Walton*, 908 F.2d 1289, 1300–1301 (6th Cir. 1990). We will find clear error only if, after reviewing the full record, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

The Sentencing Guidelines advise that a defendant is accountable for "all acts and omissions" that were: "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). In a drug-conspiracy case, this includes "all quantities of contraband that were involved in transactions carried out" by participants in the conspiracy, including by the defendant himself. *Id.* § 1B1.3(a)(1)(B) cmt. n.3(D). "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). Accordingly, a district court may extrapolate from seized drugs information about other drugs involved in the case. *See United States v. Jackson*, 470 F.3d 299, 310–11 (6th Cir. 2006); *United States v. Price*, 761 F. App'x 568, 571 (6th Cir. 2019). But it must "provide an explanation for its decision (not merely a rote extrapolation from the few to the many or an unsupported estimation)." *United States v. Rodriguez-Iznaga*, 575 F. App'x 583, 588 (6th Cir. 2014); *see also United States v. Henley*, 360 F.3d 509, 515 (6th Cir. 2004) ("In determining whether a district court's calculation of drug quantity is clearly erroneous, a key issue is the extent to which the court identified the evidence on which it relied in making that calculation.").

The district court found that Shields was responsible for 12.5 kilograms of heroin, 1,814 grams (four pounds) of methamphetamine, and 108.7 kilograms of marijuana, for a total of just under 49,000 kilograms of converted drug weight. Because this was between 30,000 and 90,000 kilograms, the court found that Shields' base offense level was 36, in accordance with the Guidelines' Drug Quantity Table. *See* U.S.S.G. § 2D1.1(c)(2).

The methamphetamine determination alone was sufficient to sustain that conclusion.[2] The Drug Quantity Table provides for a base offense level of 36 when the defendant is responsible for 1.5 kilograms or more of at least 80% pure methamphetamine. *See id.* § 2D1.1(c) & n.(B)–(C). Text messages introduced at trial showed that in January 2015, Shields asked for "four bottles" of "glass." Avendano testified that "bottles of glass" referred to "pounds of meth." And he confirmed that "when bottles are mentioned, that's methamphetamine[.]" Faced with this evidence, Shields' trial counsel conceded at the sentencing hearing that his client was responsible for "4 pounds" or "1,814 grams of methamphetamine." Nevertheless, counsel protested that the government had no evidence as to the purity of the methamphetamine that Shields ordered in the text exchange, as that particular package was never seized. The government, however, pointed to other packages seized in 2015 that were also sent to Memphis by the Avendano organization. Lab testing revealed that those packages contained methamphetamine ranging from 94 to 100 percent purity. The district court found that this was "pretty strong proof" that "the methamphetamine sent from California in connection with Mr. Shields was actual methamphetamine" too, as opposed to some diluted mixture.

We see no clear error in that conclusion. It was Shields' obligation to "produce some evidence that call[ed] the reliability or correctness of the alleged [purity] into question." *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (citation omitted). And "[a]side from bald assertions, [he] failed to produce any evidence" to refute that assessment. *United States v. Adkins*, 729 F.3d 559, 570 (6th Cir. 2013). Not to mention, the district court's estimate of the total weight attributable to Shields was conservative. The government also pointed to another package that

---

[2] For this reason, we need not address Shields' argument related to the amount of heroin attributable to him. Either way, his base offense level would be 36.

was mailed to an address Shields had provided to a Los Angeles number in relation to the sending of "bottles." Though the Postal Service discovered nine packages sent to that same location, the district court ignored all of them in arriving at its final figure of just four pounds of methamphetamine. And it further ignored any evidence regarding the pounds of meth sent to Shields' coconspirators. The district court's determination of the quantity of drugs attributable to Shields was not clearly erroneous.

B.

We next consider Shields' claim that his counsel rendered ineffective assistance in withdrawing an objection to a two-level increase for possession of a firearm. In general, "a defendant may not raise ineffective assistance of counsel claims on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Ledbetter*, 929 F.3d 338, 364 (6th Cir. 2019) (citation omitted). Such claims are generally best raised in a motion filed under 28 U.S.C. § 2255, which gives the claimant access to "the forum best suited to developing the facts necessary to determining the adequacy of representation." *Massaro v. United States*, 538 U.S. 500, 505 (2003). This case is no exception. The trial record is "incomplete or inadequate" to assess either the reasonableness of counsel's actions at the time or any prejudice that may have resulted therefrom. *Id.* All the record shows is that counsel raised but then withdrew an objection to the firearm enhancement with no explanation. Without "additional factual development," we have "no way of knowing" why counsel did so. *Id.* We therefore decline to address the merits of Shields' claim on this direct appeal.

C.

Lastly, Shields contends that the district court failed to credit him for the 42-month prison sentence he had already completed for a related felon-in-possession charge. At the sentencing hearing, the court made clear that it intended the sentence for the present case to run "concurrent[ly]" with the felon-in-possession sentence and that Shields would "have credit back to April of 2016." The court also stated that due to this credit, Shields would have "about 16 years to go" on his sentence, even though the "total sentence [was] 240 months." The government concedes that the district court's "clear" intention was to give Shields credit "for his time served" on the related charge. Shields nonetheless protests that the written judgment makes no mention of this "credit back" and only states that the sentences would run "concurrent to each other." To correct what he sees as an ambiguity in his sentence, he asks this court to vacate his sentence and remand for resentencing.

We need not do so. Like both of the parties, we agree that the sentencing transcript here plainly evinces the district court's intent to provide Shields with a reduction in his sentence for time served. This conclusion is reinforced by the docket entry for the written sentence, which says that "[t]he Court Ordered the defendant received credit from 4/8/2016 through 12/3/2019." Thus, even if the written sentence conflicted with the district court's oral sentence, "[t]he clarity of the oral sentence . . . means that we must consider the oral sentence as controlling on appeal." *United States v. Penson*, 526 F.3d 331, 334 (6th Cir. 2008). And because the district court's intent was clear, we need not remand for clarification. We take this opportunity to confirm that Shields' total sentence is 240 months minus the time he served for the related felon-in-possession case.

* * *

For the foregoing reasons, we AFFIRM.